# IN THE COURT OF APPEALS OF IOWA

––––––––––––––––

No. 25-0323
Filed January 28, 2026

––––––––––––––––

**In re the Marriage of Joseph William Wilker and Megan Sue Wilker**

Upon the Petition of
**Joseph William Wilker,**
Petitioner–Appellee,

And Concerning
**Megan Sue Wilker n/k/a Megan Sue Schollmeyer,**
Respondent–Appellant.

––––––––––––––––

Appeal from Iowa District Court for Dubuque County,
The Honorable Monica Zrinyi Ackley, Judge.

––––––––––––––––

**AFFIRMED**

––––––––––––––––

Jamie A. Splinter of Splinter Law Office, Dubuque, attorney for appellant.

Kevin Stinn of Swartz & Stinn Law, PLLC, Waukon, attorney for appellee.

––––––––––––––––

Considered without oral argument
by Schumacher, P.J., Ahlers, J., and Bower, S.J.
Opinion by Schumacher, P.J.

1

**SCHUMACHER, Presiding Judge.**

Megan Schollmeyer appeals an order modifying the physical care and child support provisions of the decree dissolving her marriage to Joseph Wilker. Megan also contests the district court's award of trial attorney fees, and both parties request appellate attorney fees. Upon our review, we affirm the district court's modification order, and we decline to award appellate attorney fees to either party.

## I.      Background Facts and Proceedings

Megan and Joseph married in 2008 and divorced in 2016. Their two children, M.W. and B.W., were born in 2010 and 2012. The parties' stipulated decree ordered joint legal custody, physical care with Megan, and weekly visitation to Joseph "from Friday after school to Sunday night."[1]

Joseph remained in the family home in Garnavillo. Megan began another relationship and moved to Wisconsin. That relationship ended, and after several moves, Megan eventually settled in Dubuque, approximately one hour from Joseph's home in Garnavillo. After the parties' divorce, Joseph "still wanted to pursue a relationship" with Megan. But after approximately five years, Joseph realized they "were officially done." Meanwhile, Megan began a relationship with Jeff in 2021, whom she married in 2023. Joseph began a relationship with Jamie in 2022, whom he married later that year. Jamie and her two teenage children moved into the Garnavillo home.

By all accounts, the parties' co-parenting relationship went smoothly until 2022. Their ability to co-parent began to decline when Joseph, for the

---

[1] The parties agreed to "one week 'on' one week 'off'" summer visitation.

first time since the divorce, began a new relationship. Megan stated that M.W., who was diagnosed with autism in 2018, "struggles with change" and had "sensory overload" with Joseph's new relationship. Megan complained that Joseph's relationship progressed too quickly for M.W. and B.W., and "they didn't have the option of getting a bond with Jamie beforehand." Megan also stated that she and Joseph had retained "a very close friendship," which "just suddenly changed drastically" when Joseph and Jamie got together. Megan admitted she was "a very jealous mom" and she wished that she and Joseph could "still co-parent" the same way.

Joseph noticed that "as soon as" he told Megan he was moving on with another person, "child support became an issue." Per the parties' decree, Joseph was ordered to pay $250 per month in child support. In November 2022, Joseph and Megan entered a handwritten agreement that Joseph would pay $869 per month.[2] But by early 2024, Joseph felt like the parties "had gotten so far into the woods with . . . not being able to co-parent," and he reverted to paying the original amount of child support ordered by the court.

Meanwhile, a poignant event took place in early February 2024. Joseph recalled that M.W. and B.W. had "a very typical weekend" in Garnavillo. As the children left on Sunday to return to Megan's house, M.W. "gave Jamie a hug," "expressed how much she enjoyed the weekend," and stated she was "looking forward to being here next weekend." A few days later, Megan and Joseph had an argument, and according to Joseph, things "spiraled" from there. Within a few days, M.W. had an incident at school, during which she became "distraught and inconsolable."

_____

[2] They did not file the agreement with the court.

The next day, Megan took M.W. to the emergency room, reporting that M.W. expressed that she "wanted to hurt Jamie" and herself. While at the hospital, Megan had a teleconference with a psychiatrist. According to Megan, the psychiatrist recommended that M.W. have "a break from dad" and participate in counseling to "feel better about going back to dad's." Megan stated that after the hospitalization, M.W. "spent a lot of time in the bedroom, very depressed" and was unable to articulate her feelings.

M.W.'s hospitalization "took [Joseph] by surprise" because he felt things had been going well. Joseph believed M.W. had developed a close relationship with Jamie, whose younger child was the same age as M.W. and was also on the autism spectrum. Joseph initially agreed to have visits with only B.W., but he soon began to resist Megan's refusal to bring M.W. to visits,[3] maintaining there was another "side of the story." Although Megan refused to bring M.W. to visits, she told Joseph she would allow him to see M.W. "on [her] time" if he came to see the children at her house.

In March, Megan filed a petition for modification, requesting sole legal custody of the children and reduction of Joseph's parenting time. To support her petition, Megan alleged the following change of circumstances:

> A. [M.W.] has had significant mental health issues recently. Her doctor has advised she should not return to [Joseph]'s care until family counseling is accomplished.
>
> B. When [M.W.] is at [Joseph]'s home for parenting time, [Joseph] refuses to allow [M.W.] to have contact with [Megan].
>
> C. The stepmom, Jamie Wilker, has been emotionally abusive to [M.W.].

---

[3] Joseph filed an application for rule to show cause based on Megan's refusals to comply with the decree's visitation schedule. The application was dismissed by the court.

D. [Joseph] and stepmom tell [M.W.] that [M.W.] will go to prison if [M.W.] lies.

E. [M.W.] has escalated to threatening to self-harm because of the fear she has of going to [Joseph]'s home. [M.W.] was seen at the Finley Emergency Department and is getting further care from Dubuque Pediatric Psychiatry, and Covenant Family Solutions.

Joseph filed an answer and counterclaim, requesting the court maintain joint legal custody and modify the decree to place physical care of the children with him and order reasonable visitation for Megan. Joseph agreed with Megan that there had been a substantial and material change in circumstances since the decree was entered,[4] including:

A. [Megan] has refused to have [M.W.] participate in visitation with [Joseph] since February 2024;

B. [Megan] has refused to support the relationship between [Joseph] and [M.W.];

C. [Megan] has encouraged [M.W.]'s lack of participation in family counseling with [Joseph] and his wife; and

D. [M.W.]'s mental health continues to deteriorate because of [Megan]'s projections of her issues with [Joseph] onto the child.

Joseph further alleged his "home is better suited to handle a child with special needs such as [M.W.]'s."

Around this time, the Iowa Department of Health and Human Services initiated a child abuse assessment concerning allegations that Jamie was "locking [M.W.] in her room for extended periods of time," M.W. "does not feel safe with

---

[4] Specifically, the district court noted that Joseph "argues there is no change of circumstance to justify the modification but alternatively argues that if the Court finds a change, that he be awarded primary care of the minor children and appropriate child support."

Jamie," and Joseph "refuse[d] to suspend visitation despite knowing the trauma it is causing [M.W.]" The department determined the allegations were unfounded.

In April, Megan brought M.W. to the emergency room again because M.W. stated that "she was planning to hurt herself." M.W. spent two weeks in inpatient treatment. Shortly thereafter, M.W. "changed her story"; she acknowledged she had fabricated the allegations about Jamie and stated she was not fearful of Joseph's home. The parties, as well as M.W.'s medical providers, agreed she "struggles" with telling the truth at times, which is common for children with autism. Throughout this turmoil, Joseph maintained that M.W.'s behavior at his home "doesn't match" what Megan described. At the same time, the parties agreed their younger child, B.W., was doing well and had adapted given the circumstances.

Trial took place over three days in December. At the close of trial, Megan retracted her request for sole legal custody but stated she did not want to dismiss her petition.[5] She filed a proposal asking for physical care to remain the same except "that she gets weekend time with the children, specifically every other weekend," and that "the summer schedule . . . remain[s] as the school year schedule, with the change that Megan gets weekends as requested." She also asked that Joseph pay child support "based on the child

---

[5] In her brief on appeal, Megan states, "Nowhere in the trial did Megan ask for sole legal custody," which the district court "takes significant offense to." Yet Megan's petition specifically requested an order of sole legal custody. But at the end of the third day of trial, Megan stated, "I would still like [Joseph] to be able to have some decision-making." The court responded, "I can't do that," and explained that if an order for sole custody was issued it would "cut this man out completely."

support guidelines," "back date[d] to three months from the filing of the petition."

The district court found a substantial change in circumstances had occurred. Specifically, the court noted that although the parties had co-parented well for a few years after they divorced and neither was remarried, "the hammer fell" when Joseph "decided to move on" and got remarried to Jamie. The court found that since then, "Megan has placed M.W. in a position of polarity with her feelings for both parents, which has caused her mental anguish contributing to her attempts at self-harm." After weighing the parties' relative caretaking abilities and the best interests of the children, the court found Joseph "is the better parent to provide care to the girls, especially M.W."

Accordingly, the court modified the decree to place physical care with Joseph. The court ordered visitation for Megan on the second, third, and fourth weekends each month, from after school on Friday to Monday morning, and alternating weeks in the summer. The court ordered Megan to pay $622 per month in child support.[6] Finally, the court ordered Megan to pay $13,000 toward Joseph's attorney fees. Megan appeals.

## II.    Standard of Review

An action to modify a decree of dissolution of marriage is an equitable proceeding, which we review de novo. Iowa R. App. P. 6.907; *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). "While we are not bound by the fact-findings of the district court, we give them weight, especially as to credibility determinations." *Venechuk v. Landherr*, 20 N.W.3d 471, 475 (Iowa

---

[6] When only one child qualifies for child support, the amount is reduced to $421 per month.

2025) (citation omitted). The children's best interests are our primary consideration. Iowa R. App. P. 6.904(3)(n); *Hoffman*, 867 N.W.2d at 32. We also review issues concerning child support de novo. *Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005).

### III. Modification of Physical Care

Megan challenges the court's modification of physical care. She reasons that if the district court found that shared care is "appropriate . . . during the summer, then primary care should have remained with her as the primary care parent and Joseph failed to meet his very heavy burden of a material and substantial change in circumstances." Megan further claims Joseph failed to show "that he and his home would be superior for the girls, specifically M.W."

The principles relating to modification of the physical-care provisions of a dissolution decree are well-established:

> To change a custodial provision of a dissolution decree, the applying party must establish by a preponderance of evidence that conditions since the decree was entered have so materially and substantially changed that the children's best interests make it expedient to make the requested change. The changed circumstances must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary. They must relate to the welfare of the children. A parent seeking to take custody from the other must prove an ability to minister more effectively to the children's well being. The heavy burden upon a party seeking to modify custody stems from the principle that once custody of children has been fixed it should be disturbed only for the most cogent reasons.

*In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983).

Here, the district court found that after reviewing all the relevant factors, a material and substantial change in circumstances had occurred

since the decree that would justify changing the physical-care provisions of the parties' dissolution decree. Indeed, the parties agreed there was sufficient change in circumstances for modification in that they were no longer able to co-parent effectively and the children, especially M.W., were being impacted to their detriment by the turmoil and lack of consistency between their parents' households.[7] "Discord between parents that has a disruptive effect on children's lives has been held to be a substantial change of circumstance warranting modification of a custody decree." *In re Marriage of Malloy*, 687 N.W.2d 110, 114 (Iowa Ct. App. 2004); *see also Rolling v. Hoffman*, No. 14-0102, 2014 WL 2600315, at *2 (Iowa Ct. App. June 11, 2014) ("In custody modification cases, stability is the trump card."). Under the facts and circumstances presented here, the parents' inability to resolve issues between them and prioritize the children's best interests made their previous physical-care arrangement unworkable. We concur with the court that Joseph has shown a substantial change of circumstances.

We turn to whether Joseph has shown he can render superior care. Joseph continues to live in the family home, where he has lived for more than ten years. He has been employed at the same company since 2017. Joseph lives with his wife, Jamie, and her two teenage children. Jamie is "in tune" with parenting children with autism like M.W., and Joseph has "embraced" "different things [from what] Jamie was doing with [her son]." In Garnavillo, the children would attend a "much smaller," "close knit" school, which they had visited "on a couple different occasions" and "they have friends" who

---

[7] Both Megan and Joseph alleged that a substantial change of circumstances warranted modification of the decree, and Megan testified to such at trial. To that end, we find it somewhat disingenuous that Megan now disputes there was a change of circumstances, only after the court entered a modification order denying her request and granting Joseph's.

attend school there. M.W. would be in the same grade as Jamie's son with autism, with whom the school had been "very welcoming as far as making accommodations."

Further, Joseph has shown the ability to support the children's relationship with Megan and her husband, Jeff. Joseph testified that both Jamie and Jeff "bring a lot to the table" and that he considers both parties and their new spouses "to be in this together." Joseph is also supportive of Megan's parenting time with the children, stating, "I . . . know that both the girls love Megan, both girls love Jeff. I would not want to disrupt that any more than it has to be." This testimony is in stark contrast to Megan's relative lack of support for Joseph's relationship with M.W. As the court stated:

> Joe has been and continues to be supportive of the girls' relationship with their mother and her new spouse. Jeff is a kind person and expresses support for his wife; he has no experience in raising children, let alone one with autism. Jamie is supportive of her husband and the children. She was much more supportive of the relationship the children had with their mother until all the turmoil surfaced and DHHS became involved. She has been emotionally hurt, which was evident in her posture during her testimony. She is understandably defensive. Jamie has experience raising children and one with autism. Jamie's son's therapist noted that Jamie is well-equipped to provide guidance and skill building with an autistic child.
>
> There was little testimony about Jeff's role in the girls' lives as it appears all the child rearing is in the hands of Megan in the Schollmeyer home. B.W. has a good relationship with Jamie and her children. Joe and Jamie show concern and respect for one another. Joe is accepted and loved by Jamie's children. Jamie recognizes the importance of Joe's relationship with his daughters. Both stepparents are incredibly supportive of parental involvement and the needs of the girls.
>
> . . . .
>
> Megan is not accepting of Joe's relationship with his new wife. As a result, she has used M.W. to gather information and to express discontent

about what is going on in the Wilker home.[8] Megan has placed M.W. in an unenviable position. Where B.W. is able to see the forest for the trees and just rolls with the changes, M.W. cannot due to her lack of adaptable thinking and inability to express her frustration properly. The best interest of M.W. dictates that she sees more of her father. The Court does not deem it fit to separate the children to accomplish this. In making changes to the custodial arrangement and the visitation, the Court recognizes that the continuity required by a child like M.W. will be disrupted. The Court finds that based on the personalities of the parents and their composure viewed in the courtroom, Joe is more capable than Megan of making the changes in a way that will have less impact on M.W.

We concur with the court's analysis. We find no error with the court's modification of physical care. We affirm on this issue.

## IV.    Child Support

The district court used the child support guidelines to calculate child support, using $37,000 yearly income for Megan and $82,879 yearly income for Joseph. Megan claims the court's calculation of child support is incorrect because the court imputed income to her but failed to impute additional

---

[8] Repeatedly in her brief, Megan points to exhibits that include recordings of Joseph and Jamie talking to M.W., claiming they prove that Joseph is not supportive of Megan's relationship with M.W.  According to Megan, "Joseph and Jamie were clearly badgering M.W. about her mom and trying to make her believe her mom was a liar." Although we—like the district court—do not condone the parents recording the children, we have reviewed the exhibits. They do not support Megan's claims. Instead, the recordings show, as the district court found:

> [Joseph] is calm and attentive to his daughter when he speaks with her. He explains situations and tries to help her find ways of dealing with them, expressing how she feels about them and what they mean to all concerned. He also does not pressure her to tell him what is happening in her mother's home. He tries to help her see that escape and avoidance will not resolve a situation.

income to Joseph for his self-employment. Relating to the parties' income, the district court stated:

> Megan is not employed. She was previously employed by Hobby Lobby and reported an income of $37,079.32 in 2023. She does not have any mental or physical ailments or other issues that would prevent her from being employed. The girls are at school all day, so they are not in need of Megan's care during those hours. Jeff is employed at John Deere Dubuque Works. He has employer provided insurance that covers the girls. The Court attributes income to her in the amount she was able to previously earn.

> Joe is employed full-time at Pattison Company. He also does some custom work for farmers. He has employer provided insurance. His income for 2023 was $73,279.78 as reported on his 2023 W-2. He is enrolled in a Health Savings Account, a 401K plan and a Café 125 plan that are deducted pre-tax. His taxable income was reported as $61,901.29. He has health insurance available to him through his employer. The health plan is $50 for an individual and $270 for family. Dental coverage is $20 for an individual and $85 for family. Vision coverage is $3 and $9.50 for family. His custom farming operation shows monthly income of $4,800.00. No taxes are deducted from the income. His welding business reports $4,898.00 in receipts. No taxes are deducted from the income. He deducts depreciation of tools, hog buildings, insurance expenses and supplies. He reports a loss for both the custom farming and the welding businesses.

Megan claims her child support obligation should be "based on [her] actual earnings," which she estimated to be $18,849 for 2024. Megan stated she works "[p]art-time" at her parents' farm earning $25 per hour. She testified there was nothing physically preventing her from working forty hours per week "[o]ther than the kids' schedules." Megan testified she had "done a lot of different jobs," including working at schools and at Hobby Lobby, but she preferred to maintain flexibility "to work with the kids' schedule" and "be home with them."

Relating to Joseph's income, Megan claims the court "used no income for Joseph's earnings from his welding or farming." However, the court

added approximately $10,000 to Joseph's reported earnings and approximately $20,000 to his taxable earnings. Joseph testified his Pattison income included some overtime and he did work a little on the side, but he was trying not to add too many extra jobs due to his history of "working a lot" and he "did not want to fall into that again." With regard to hog feeding, Joseph stated he could make up to $4,800 per month, but he paid for deductions and debt from that amount. Relating to welding, Joseph stated his "biggest" job, which he rarely had time to do, "was under $500."

In considering a party's income, the court must consider all circumstances relating to that party's income. *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). As a reviewing court, we realize that determining self-employment income may be difficult. *In re Marriage of Chickering*, No. 25-0658, 2025 WL 3171342, at *6 (Iowa Ct. App. Nov. 13, 2025). "As a whole, the parties' income must be determined from the most reliable evidence presented." *Id.*; *see also In re Marriage of Knickerbocker*, 601 N.W.2d 48, 51 (Iowa 1999) ("In calculating child support, the first step is to determine the parents' current monthly net income from the most reliable evidence presented."). Under this record, we decline to disturb the court's findings of the parties' income for child support purposes.

Megan also argues "the court failed to provide a written determination as required under the child support rules as the basis for imputing income." To the contrary, we believe the court provided adequate basis for its income determinations based on the evidence presented. In any event, we "see no reason to extensively rehash how the district court arrived at this figure." *Chickering*, 2025 WL 3171342, at *5. We affirm on this issue.

## V. Trial Attorney Fees

Megan challenges the court's order that she pay $13,000 toward Joseph's attorney fees. Iowa Code section 598.36 (2024) governs the award of attorney fees in a modification proceeding. The statute provides that, in such a proceeding, "the court *may* award attorney fees to the prevailing party in an amount deemed reasonable by the court." Iowa Code § 598.36 (emphasis added). Section 598.36 gives the district court considerable discretion in determining whether the district court should award such fees. *In re Marriage of Maher*, 596 N.W.2d 561, 568 (Iowa 1999). An award of attorney fees in an action to modify a dissolution decree rests in the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *In re Marriage of Romanelli*, 570 N.W.2d 761, 765 (Iowa 1997). "We reverse the district court's ruling only when it rests on grounds that are clearly unreasonable or untenable." *In re Marriage of Erpelding*, 917 N.W.2d 235, 238 (Iowa 2018) (citation omitted).

After trial, Joseph filed an affidavit of trial attorney fees stating his expenses incurred "to date" totaled $23,902.27, and his outstanding fees totaled $18,962.07. As noted, the court ordered Megan to pay $13,000 toward Joseph's outstanding balance, a portion of his trial attorney fees.

Megan maintains that considering her income of $18,849 per year, "[a]fter payment of the attorney fee judgment, [she] would only have income of $5,849." She claims that she "does not even earn sufficient funds to pay the child support and the judgment for attorney fees." Given the totality of the circumstances presented here, we cannot say the district court's award of $13,000 to Joseph was an abuse of discretion. Accordingly, we affirm.

## VI.  Appellate Attorney Fees

Both parties request appellate attorney fees. Neither requests a particular amount nor filed an affidavit supporting their request. An award of appellate attorney fees is not a matter of right but rests within our discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). In deciding whether to award appellate attorney fees, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). In consideration of these factors, we deny the parties' requests.

## VIII.  Conclusion

We affirm the district court's modification order. We decline to award appellate attorney fees. Costs on appeal are taxed to Megan.

**AFFIRMED.**